# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DANIEL D. SADOWSKY, Ph.D.,** | : | |
| | : | Case No. |
| Plaintiff, | : | |
| | : | **COMPLAINT** |
| v. | : | |
| | : | Filed on Behalf of Plaintiff |
| **UNIVERSITY OF PITTSBURGH** | : | |
| **OF THE COMMONWEALTH** | : | Counsel of Record for Plaintiff |
| **SYSTEM OF HIGHER** | : | |
| **EDUCATION**, | : | Thomas W. King III, Esq. |
| | : | PA ID # 21580 |
| Defendant. | : | tking@dmkcg.com |
| | : | |
| | : | Thomas E. Breth, Esq. |
| | : | PA ID # 66350 |
| | : | tbreth@dmkcg.com |
| | : | |
| | : | |
| | : | Dillon McCandless King Coulter |
| | : | & Graham LLP |
| | : | 128 W. Cunningham Street |
| | : | Butler, PA 16001 |
| | : | Telephone: 724-283-2200 |
| | : | Facsimile: 724-283-2298 |
| | : | |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL D. SADOWSKY, Ph.D.,    :

    :   Case No.

    Plaintiff,    :

    :   **COMPLAINT**

    v.    :

    :

**UNIVERSITY OF PITTSBURGH**  :

**OF THE COMMONWEALTH**  :

**SYSTEM OF HIGHER**  :

**EDUCATION,**    :

    :

    Defendant.    :

    :

## COMPLAINT

Plaintiff, Daniel D. Sadowsky, by and through his undersigned attorneys file the within Complaint averring in support thereof as follows:

### PARTIES

1. Plaintiff, Daniel Sadowsky, Ph.D., is a 42-year-old white heterosexual male who resides in McKean County, Commonwealth of Pennsylvania (hereinafter referred to as "Professor Sadowsky").

2. At all times relevant to this Complaint, Professor Sadowsky was employed by Defendant as a tenure-track professor teaching at the University of Pittsburgh at Bradford (hereinafter referred to as "Pitt-Bradford") located at 300 Campus Drive, Bradford, McKean County. Commonwealth of Pennsylvania.

1

3.    Defendant, University of Pittsburgh of the Commonwealth System of Higher Education (hereinafter referred to as "Defendant") is a state-related university with its principal administrative offices located at Cathedral of Learning, 4200 Fifth Avenue, Pittsburgh, Allegheny County, Commonwealth of Pennsylvania.

4.    At all times relevant to this Complaint, Defendant operates several regional campuses, including, the University of Pittsburgh at Bradford, which is located at 300 Campus Drive, Bradford, McKean County, Commonwealth of Pennsylvania.

5.    At all relevant times to this Complaint, Defendant employed at least fifteen (15) employees and was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 954(b).

## JURISDICTION AND VENUE

6.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Professor Sadawsky asserts claims arising under Title VII, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1983 to redress the deprivation of rights secured by the Equal Protection Clause of the Fourteenth Amendment.

7.    This Court also has jurisdiction under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4).

2

8.     This Court has supplemental jurisdiction over Professor Sadowsky's related claim under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq., pursuant to 28 U.S.C. § 1367(a), because that claim forms part of the same case or controversy as Professor Sadowsky's federal claims.

9.     Venue is proper in this Court under Title VII's special venue provision, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Professor Sadowsky's claims occurred in McKean County, Pennsylvania, within the Western District of Pennsylvania.

10.     Professor Sadowsky timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission (hereinafter referred to as "EEOC") on August 29, 2023, Charge No. 533-2023-02051.

11.     Professor Sadowsky's charge alleged discrimination based on race and sex arising from Defendant's denial of tenure and promotion.

12.     In his signed charge, Professor Sadowsky expressly stated in relevant part "I want this charge filed with both the EEOC and the State or local Agency, if any."

13.     The charge identified the Pittsburgh Commission on Human Relations as the state or local fair-employment-practices agency and indicated that the charge was presented to that agency and the EEOC.

3

14.    Upon information and belief, and by operation of the applicable work sharing and referral arrangements and Professor Sadowsky's express dual-filing election, Professor Sadowsky's charge was dual-filed with, or is deemed filed with, the Pennsylvania Human Relations Commission (hereinafter referred to as the "PHRC") as of August 29, 2023.

15.    The administrative charge presented the same race-discrimination and sex-discrimination claims asserted under the PHRA as set forth herein.

16.    More than one year has elapsed since the filing of Professor Sadowsky's administrative charge without the PHRC entering into a conciliation agreement related to Professor Sadowsky's charge.

17.    The EEOC issued Professor Sadowsky a Determination and Notice of Rights on April 30, 2026.

18.    Professor Sadowsky received the EEOC Notice electronically on April 30, 2026.

19.    This action is filed within ninety days of Professor Sadowsky's receipt of the Notice.

20.    Professor Sadowsky has satisfied the applicable administrative prerequisites including the PHRA's one-year administrative-exclusivity period.

21.    A copy of this Complaint will be served upon the PHRC as required by 43 P.S. § 962(c)(2).

22.    Plaintiff, Daniel D. Sadowsky, demands a trial by jury in the United States District Court for the Western District of Pennsylvania.

## FACTUAL BACKGROUND

23.    The preceding paragraphs are incorporated herein by reference and made a part hereof as if fully set forth herein.

24.    Professor Sadowsky is a chemist, educator, and researcher who was appointed to the faculty of Pitt-Bradford on September 1, 2017, as a tenure stream assistant chemistry professor.

25.    Since his appointment, Professor Sadowsky devoted substantial effort to each of Defendant's principal tenure criteria: teaching, scholarship, and service.

26.    Professor Sadowsky taught forty-five (45) sections of chemistry and chemistry related courses and laboratories.

27.    Professor Sadowsky's course and laboratory instruction hours exceeded Defendant's standard faculty teaching load in nearly every semester.

28.    Professor Sadowsky developed a course in computer programming for mathematics and science majors.

29.    Professor Sadowsky completed a comprehensive rewriting of the laboratory manuals for the general chemistry sequence.

30.    Professor Sadowsky supervised undergraduate student research for presentation by the students at academic conferences.

31.    Professor Sadowsky published two peer-reviewed papers in reputable journals, *Physical Chemistry Chemical Physics* and *AIP Advances*. One of Professor Sadowsky's published papers was selected as an "Editor's Choice."

32.    Professor Sadowsky obtained four (4) significant grants for computational research time from Defendant's Center for Research Computing; received a summer undergraduate research grant; and served as Senior Personnel on a National Science Foundation grant.

33.    Professor Sadowsky reviewed eleven (11) manuscripts for two (2) academic journals; presented at three (3) academic conferences; and participated in eight (8) undergraduate research conferences.

34.    Professor Sadowsky compiled an extensive service record, including, but not limited to, Chair of the Penn-York Local Section of the American Chemical Society; organizer of the Twin Tiers Science and Engineering Fair; service on the Faculty Senate and Peer-review Committees; and planning, participated and support of Pitt-Bradford's admissions events, trainings, and retreats.

35.     An external reviewer described Professor Sadowsky's service in relevant part as "Dr. Sadowsky has established an extensive and varied record of service to his college, the university, and the broader community. He has devoted extraordinary time and effort to various committees and programs."

36.     Professor Sadowsky's credentials, experience, and tenure file reflected sustained teaching effort, measurable teaching improvement, meaningful curricular development, peer-reviewed scholarship, external research support, undergraduate mentorship, and substantial University and professional service.

37.     Ann E. Provost Cudd, served as Defendant's Provost and Senior Vice Chancellor from 2018 until the summer of 2023 (hereinafter referred to as "Provost Provost Cudd").

38.     Provost Provost Cudd, as Defendant's Provost, exercised substantial authority and influence over Defendant's decisions regarding the hiring, promotion, and tenure status of faculty.

39.     Provost Provost Cudd contributed Chapter 12 – <u>What is Equality in Higher Education?</u> of a book titled <u>The Equal Society, Essays on Equality in Theory and Practice</u>. *Bloomsbury Publishing, December 24, 2015.*

40.     In Chapter 12, in the context of access to higher education, Provost Provost Cudd writes in relevant part as follows:

7

A society concerned with promoting flourishing lives will enhance these non-positional values inherent to education. But education is also a positional good among individuals who are competing for economic, political, and social dominance with each other. The positional good of education is greater for one individual when others have less of it. As an important good for succeeding in social competition and for individual flourishing, justice points in the direction of equal distribution of education.

*The Equal Society, p. 267.*

41.    Provost Provost Cudd advocates for cultural diversity stating in relevant part as follows:

Such policies [admissions policies] should take into account the need for a culturally diverse elite by taking cultural competence in underrepresented cultures to be a primary form of qualification for membership in the elite leadership group.

*The Equal Society, p. 272.*

42.    Further, Provost Provost Cudd believes that it's appropriate for universities to actively influence the process to achieve diversity goals stating in relevant part as follows:

Schools could choose to put a thumb on the scale for certain attributes and talents in order to "craft a class" that meets diversity goals. Such a situation would effectively meet the social ideas I set out in the previous section.

*The Equal Society, p. 280.*

43.    Provost Provost Cudd's statements clearly establish her willingness to apply discriminatory criteria in the admission process to achieve a culturally diverse elite group of leaders.

8

44. Inconsistent with Provost Provost Cudd's goal, at all times relevant to this Complaint, Defendant maintained University Policy CS 07 - <u>Nondiscrimination, Equal Opportunity, and Affirmative Action</u> (hereinafter referred to as "Affirmative Action Policy").

45. Defendant's Affirmative Action Policy states in relevant part "The University of Pittsburgh, as an educational institution and as an employer, values equality of opportunity, human dignity, and racial/ethnic and cultural diversity."

46. Defendant's Affirmative Action Policy further provides that Defendant will "continue to take affirmative steps to support and advance these values consistent with the University's mission."

47. Defendant's Director of Affirmative Action, Diversity and Inclusion (hereinafter referred to as "ADI Director") was responsible for the implementation and monitoring of Defendant's Affirmative Action Policy, including, its equal employment opportunity and affirmative action programs.

48. Defendant's ADI Director's responsibilities included collecting, maintaining, and analyzing statistical data required by Defendant's Affirmative Action program.

49. Defendant's Affirmative Action Policy expressly directed the University to review "all hiring, promotion, transfer, compensation, tenure,

9

advertising and/or publicity, admissions, financial aid, and institutional access policies" to help ensure compliance with Defendant's nondiscrimination, equal opportunity, and affirmative action objectives.

50.    Defendant's formal affirmative action structure therefore expressly encompassed faculty hiring, promotion, and tenure.

51.    On April 22, 2021, Pitt-Bradford President Catherine Koverola announced that Pitt-Bradford would welcome eight (8) new Assistant Professors in fall 2021, to wit:

(a)    Dr. Amy Gresock, Assistant Professor of Business Management;

(b)    Dr. Malik Elhaj, Assistant Professor of Accounting;

(c)    Dr. Tsangyao Chen, Assistant Professor of Information Systems/CIST;

(d)    Dr. Rabi'a Hakim, Assistant Professor of English;

(e)    Dr. Adedoyin Ogunfeyimi, Assistant Professor of English;

(f)    Dr. Abdulhakim Amer Agll, Assistant Professor of Engineering;

(g)    Dr. Olanrewaju B. Morenikeji, Assistant Professor of Biology; and

(h)    Dr. Obinna Paschal Ezeihuoma, Assistant Professor of Criminal Justice.

52.    With respect the hiring process, President Koverola described the hiring cycle in relevant part as "This year we had an unprecedented number of faculty searches as well as highly qualified applicant pools."

10

53. Upon information and belief, of the eight Assistant Professor appointments announced in President Koverola's email, none were tenure-stream appointments.

54. None of the eight faculty members selected during that hiring cycle was a white man.

55. Defendant's contemporaneous Pitt-Bradford mission statement expressly identified "Diversity," "Equity," and "Inclusion" as institutional values.

56. In April 2022, Defendant's *University Times* reported that Pitt-Bradford had hired Tasha Alston in January 2021 as its inaugural Diversity and Inclusion Officer. The article noted that McKean County "is more than 93 percent white" and quoted Alston as stating that her position provided an opportunity "to be able to advance the footprint of DEI and to create initiatives that are going to support not only current students, but future students as well."

57. In March 2023, while Professor Sadowsky's tenure application was awaiting Provost Provost Cudd's decision, Defendant's University Times reported that Provost Provost Cudd had been recognized for her commitment to "the vital importance of racial equity."

11

58. The same article reported that efforts to open opportunities to individuals from different backgrounds "aligns exactly with [Provost Provost Cudd's] core values."

59. On March 10, 2023, Defendant announced that Provost Cudd would depart Pitt later that summer to become President of Portland State University.

60. Approximately six weeks after that announcement, Provost Cudd rejected Professor Sadowsky's tenure application, overriding the unanimous recommendation of Pitt-Bradford's Tenure and Promotion Committee and the successive recommendations of Interim Vice President and Dean of Academic Affairs David E. Fitz (hereinafter referred to as "Dean Fitz") and Pitt-Bradford President Richard T. Esch (hereinafter referred to as "President Esch").

61. Defendant's faculty-hiring pattern, the demographic priorities surrounding faculty employment, Provost Cudd's stated philosophy, Provost Cudd's rejection of the unanimous and successive recommendations supporting Professor Sadowsky, Defendant's treatment of other tenure candidates, and Provost Cudd's materially false characterization of Professor Sadowsky's teaching collectively support an inference or finding that Professor Sadowsky's race and sex resulted in the wrongful denial of Professor Sadowsky's application for tenure.

12

62. Professor Sadowsky submitted his tenure dossier on or about May 7, 2022, and applied for tenure and promotion during the 2022-2023 academic-review cycle.

63. On October 27, 2022, Pitt-Bradford's Tenure and Promotion Committee (hereinafter referred to as "Tenure Committee") met to review Professor Sadowsky's tenure dossier and determine whether to recommend Professor Sadowsky for tenure and promotion.

64. Eight University Professors were selected by Defendant to serve on the Tenure Committee. Those Professors are as follows:

(a)    Dr. Matthew Kropf;

(b)    Dr. Kira Leck, Chair;

(c)    Dr. Nancy McCabe;

(d)    Dr. Mary Mulcahy;

(e)    Dr. Stephen Robar;

(f)    Dr. Jean Truman;

(g)    Dr. Donald Ulin; and

(h)    Dr. Hashim Yousif.

65. All eight members of Defendant's Tenure Committee voted to recommend approval of Professor Sadowsky's application for tenure.

13

66. The Tenure Committee members were responsible for independently reviewing and validating the academic credentials, performance information, and supporting materials contained in Professor Sadowsky's tenure dossier.

67. Their responsibilities included assessing Professor Sadowsky's performance in the three principal areas of faculty review: teaching effectiveness, professional development, and service.

68. In assessing Professor Sadowsky's teaching, the Committee considered teaching-effectiveness scores, student evaluations, teaching-related activities, course and curriculum development, reports of classroom visitations, the Peer Review Committee's findings, the division-chair assessments, and the external evaluations.

69. In assessing Professor Sadowsky's professional development, the Committee considered his scholarly productivity, peer-reviewed publications, grants, conference presentations, research activities, professional recognition, and mentorship of undergraduate research.

70. In assessing Professor Sadowsky's service, the Tenure Committee members considered Professor Sadowsky's service to Pitt-Bradford, the University, his academic discipline, professional organizations, and the surrounding community.

71. The Tenure Committee members were required to evaluate the evidence, rate Professor Sadowsky's performance, determine whether Professor

Sadowsky satisfied Defendant's tenure standards, and make a recommendation concerning tenure and promotion.

72.   Because the Tenure Committee members were charged with examining and evaluating Professor Sadowsky's complete tenure record, their unanimous recommendation reflected the collective academic judgment of the faculty members whom Defendant assigned to perform that review.

73.   The Tenure Committee rated Professor Sadowsky's classroom performance "very good" by a vote of nine to zero.

74.   The Tenure Committee found: "The committee notes that Dr. Sadowsky's teaching evaluations improved substantially in the last two years of the review period, which coincided with the implementation of more frequent assessments, a project Dr. Sadowsky initiated."

75.   The Tenure Committee also quoted an external reviewer's evaluation of Professor Sadowsky's teaching: "Based on the efforts that Dr. Sadowsky is putting into his teaching and on the assessments from the students over the past six semesters, I assess his teaching as very good. Based on effort and innovations on the teaching front, I expect continued improvement in this area, and that the potential of achieving excellence on the teaching front is high."

76. The Tenure Committee rated Professor Sadowsky's course and curriculum development as either "excellent" or "very good" by a vote of nine to zero.

77. The Committee rated Professor Sadowsky's professional development as either "excellent" or "very good" by a vote of nine to zero.

78. The Tenure Committee rated Professor Sadowsky's University service "very good" by a vote of nine to zero.

79. The Tenure Committee summarized Professor Sadowsky's candidacy as follows: "The committee notes that Dr. Sadowsky was quite productive during his review period. His file displayed his dedication to responsive pedagogy and professional development, course and curriculum planning, guiding and advising students, and participating in Pitt-Bradford activities."

80. After completing their review and assessment, all nine Tenure Committee members voted to recommend Professor Sadowsky for tenure and promotion.

81. Following the Tenure Committee's review, Dean Fitz reviewed Professor Sadowsky's tenure materials and recommended that Professor Sadowsky be promoted to Associate Professor with tenure.

82. President Esch then independently reviewed Professor Sadowsky's tenure record.

83. On February 10, 2023, President Esch advised Provost Cudd that Dean Fitz's recommendation was supported by favorable reviews and endorsements from Espinoza, the Tenure Committee, and the external faculty evaluators.

84. President Esch specifically reported that the Tenure Committee had found "significant improvement" in Professor Sadowsky's teaching scores during his final two years.

85. President Esch concluded: "Since that time Dr. Sadowsky has shown significant improvement and I concur with the recommendations of Dr. Dean Fitz, Interim Vice President and Dean of Academic Affairs; Dr. Benjamin Espinoza; the Tenure and Promotion Committee and the external faculty reviewers that Dr. Sadowsky be promoted to Associate Professor with tenure."

86. As Provost, Provost Cudd possessed authority to determine whether she would recommend Professor Sadowsky's tenure and promotion to the Chancellor.

87. On April 26, 2023, Provost Cudd declined to recommend Professor Sadowsky for promotion to Associate Professor and tenure. A true and correct copy of Provost Cudd's April 26, 2023 letter is attached hereto as Exhibit A.

17

88.     Provost Cudd acknowledged that Professor Sadowsky had satisfied Defendant's tenure standards in professional development and service.

89.     Provost Cudd stated: "I have concluded that, while you have met the criteria for tenure and promotion to Associate Professor in the areas of professional development and service, you have not met the criteria for teaching and therefore I cannot recommend your tenure and promotion to the Chancellor."

90.     Provost Cudd therefore pretextually based her adverse decision exclusively upon her assessment of Professor Sadowsky's teaching.

91.     In describing Professor Sadowsky's teaching history, Provost Cudd falsely alleged: "That record shows that your teaching performance has been consistently below standard throughout your appointment at UPB, with a brief and passing period of improvement in your OMET scores in three classes from Spring 2020 through Spring 2021."

92.     Provost Cudd further alleged: "Nevertheless, you failed to engage with the University Center for Teaching and Learning to improve your teaching performance, and your performance since then has declined rather than improved."

93.     Professor Sadowsky had not sought assistance from the University Center for Teaching and Learning.

18

94.     Professor Sadowsky had instead developed and implemented his own detailed teaching improvement plan, including active-learning methods, rewritten course materials, and more frequent assessments.

95.     Professor Sadowsky provided a detailed description of his plan in the tenure dossier reviewed by the Tenure Committee members and subsequently provided to Provost Cudd.

96.     Professor Sadowsky's plan produced objectively measurable improvement as set forth in his tenure dossier and application.

97.     Based upon the OMET data, Professor Sadowsky's average score before his August 27, 2021, meeting with President Esch was approximately 3.00, while his average score after that meeting was approximately 3.48 which demonstrates significant sustained growth.

98.     Provost Cudd's assertion that Professor Sadowsky's teaching "declined rather than improved" was false, pretextual and unsupported by the documentation contained in Professor Sadowsky's tenure dossier and application.

99.     Further, Provost Cudd's assertion is directly contradicted by the unanimous recommendation of the Tenure Committee.

19

100. Further, Provost Cudd's assertion is directly contradicted by the Tenure Committee's finding that Professor Sadowsky's evaluations had "improved substantially in the last two years of the review period."

101. It is also directly contradicted by President Esch's independent conclusion that Professor Sadowsky had "shown significant improvement."

102. Provost Cudd cited the overall range of Professor Sadowsky's teaching scores without fairly accounting for their chronology or Professor Sadowsky's improvement during the period most relevant to determining whether his corrective efforts had succeeded.

103. Provost Cudd's central factual assertion concerning the trajectory of Professor Sadowsky's teaching was contradicted by the objective data and every level of Pitt-Bradford's review that recommended tenure.

104. On May 9, 2023, Professor Sadowsky formally appealed Provost Cudd's decision to Chancellor Patrick D. Gallagher.

105. Professor Sadowsky's appeal explained the specific teaching changes he had implemented and the objective improvement that followed.

106. Professor Sadowsky wrote: "In summary, the letter from Provost Provost Cudd selectively presents evidence supporting one conclusion while ignoring overwhelming evidence which contradicts it."

20

107. Professor Sadowsky further wrote: "The letter also makes a claim about the trajectory of my teaching effectiveness, which is entirely without evidence, and in fact, categorically false."

108. On or about July 14, 2023, Defendant denied Professor Sadowsky's appeal and left Provost Cudd's decision in place.

109. Professor Sadowsky alleged in his sworn EEOC charge that White female faculty members and non-White male faculty members had received more favorable treatment in the tenure process than White male faculty members.

110. Defendant granted tenure to Dr. Rebecca McHugh and Dr. Tracee Howell, both White women.

111. Upon information and belief, Rebecca McHugh's and Tracee Howell's tenure records contained substantial performance concerns comparable to or more significant than the concerns Defendant claimed were dispositive in Professor Sadowsky's case.

112. Defendant nevertheless applied its tenure standards more favorably to McHugh and Howell and granted them tenure.

113. Defendant also granted tenure to Dr. Wes Chiang, a non-White man.

21

114. Upon information and belief, Chiang's tenure record contained substantial performance concerns comparable to or more significant than the concerns Defendant claimed were dispositive in Professor Sadowsky's case.

115. Defendant nevertheless applied its tenure standards more favorably to Chiang and granted him tenure.

116. The complete tenure materials of McHugh, Howell, and Chiang are confidential University records within Defendant's exclusive possession and control.

117. After denying Professor Sadowsky tenure and while Professor Sadowsky was serving his terminal appointment, Defendant hired Dr. Femi Oloye (hereinafter referred to as "Femi Oloye"), a non-White man, as an Assistant Professor of Chemistry in Pitt-Bradford's Division of Physical and Computational Sciences.

118. Defendant hired Femi Oloye to assume the chemistry-faculty responsibilities that would remain following Professor Sadowsky's separation.

119. Defendant assigned Femi Oloye to perform materially similar instructional work, including teaching chemistry courses Professor Sadowsky previously taught.

120. Defendant declined to retain a qualified and unanimously recommended White male professor and thereafter selected a qualified non-White male professor to perform materially similar work.

121. Defendant's treatment of Professor Sadowsky, the identified tenure comparators, the absence of any White man among the eight announced 2021 Assistant Professor hires, and the subsequent selection of a non-White man to assume Professor Sadowsky's chemistry-faculty responsibilities collectively support an inference or finding that Defendant applied its employment standards less favorably to White male faculty members.

122. As a direct consequence of the denial of tenure, Professor Sadowsky was placed in a terminal faculty appointment and ultimately lost his job.

123. As a direct and proximate result of Defendant's conduct, Professor Sadowsky lost salary, benefits, retirement contributions, tenure, professional opportunities, and other compensation.

124. Professor Sadowsky also suffered emotional distress, humiliation, inconvenience, damage to his professional standing, and impairment of his academic career.

125. At all times relevant to this Complaint, Provost Cudd, Dean Fitz, President Esch, the Tenure and Promotion Tenure Committee, and the other

University officials identified herein were acting in their capacity as Defendant's officers, employees, committees, and agents within the scope of their actual or apparent authority.

## COUNT I
## TITLE VII – RACE DISCRIMINATION
### *42 U.S.C. § 1983*

126.   The preceding paragraphs are incorporated herein by reference and made a part hereof as if fully set forth herein.

127.   Professor Sadowsky is White, and Title VII protects him from discrimination because of his race.

128.   In *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 309 (2025), the United States Supreme Court held that "Title VII's disparate-treatment provision draws no distinctions between majority-group Professor Sadowskys and minority-group Professor Sadowskys."

129.   Accordingly, Professor Sadowsky is not required to establish additional "background circumstances" or satisfy a heightened pleading or evidentiary standard merely because he is a White male.

130.   Professor Sadowsky was qualified for and unanimously recommended for tenure under Defendant's applicable tenure standards.

24

131. Professor Sadowsky's qualifications are demonstrated by, among other evidence, the unanimous recommendation of the nine-member Tenure Committee, Dean Fitz's recommendation, President Esch's recommendation, and the favorable assessments contained in Professor Sadowsky's tenure file.

132. Defendant subjected Professor Sadowsky to adverse employment action by declining to recommend and grant him tenure and promotion, placing him in a terminal appointment, and ending his tenure-stream employment.

133. Defendant granted tenure or otherwise applied its tenure and promotion standards more favorably to non-White faculty members under circumstances supporting an inference of race discrimination.

134. After refusing to retain Professor Sadowsky, Defendant selected a non-White man to assume materially similar chemistry-faculty responsibilities.

135. Defendant's asserted teaching-performance rationale was pretextual.

136. Provost Cudd's assertion that Professor Sadowsky's performance had "declined rather than improved" was contradicted by Professor Sadowsky's improved teaching scores, the unanimous Tenure Committee's finding that his performance had "improved substantially," and President Esch's determination that Professor Sadowsky had "shown significant improvement."

137. Defendant's reliance upon a materially false characterization, together with its faculty-hiring pattern and more favorable treatment of non-White faculty members, supports the inference and finding that Professor Sadowsky's race and sex were a substantial motivating factor in the tenure decision.

138. Professor Sadowsky's race was a motivating factor in Defendant's decision not to grant him tenure and promotion and in the resulting cessation of his tenure-stream employment.

139. Defendant intentionally discriminated against Professor Sadowsky because of his race in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m).

140. Defendant's violations caused Professor Sadowsky the injuries and damages alleged above.

## COUNT II
### TITLE VII – SEX DISCRIMINATION
*42 U.S.C. § 1983*

141. The preceding paragraphs are incorporated herein by reference and made a part hereof as if fully set forth herein.

142. Professor Sadowsky is male, and Title VII protects him from discrimination because of his sex.

26

143. As the Supreme Court confirmed in *Ames*, Title VII does not impose a heightened pleading or evidentiary standard upon a Professor Sadowsky merely because the Professor Sadowsky belongs to a majority group. 605 U.S. at 309-10.

144. Professor Sadowsky was qualified and unanimously recommended for tenure under Defendant's applicable tenure standards.

145. Professor Sadowsky's qualifications are demonstrated by, among other evidence, the unanimous recommendation of the nine-member Tenure Committee, Dean Fitz's recommendation, President Esch's recommendation, and the favorable assessments contained in Professor Sadowsky's tenure file.

146. Defendant subjected Professor Sadowsky to adverse employment action by declining to recommend and grant him tenure and promotion, placing him in a terminal appointment, and ending his tenure-stream employment.

147. Defendant granted tenure or otherwise applied its tenure and promotion standards more favorably to female faculty members under circumstances supporting an inference of sex discrimination.

148. None of the eight Assistant Professors selected during the announced 2021 hiring cycle was a White man.

149. Defendant's asserted teaching-performance rationale was pretextual.

150. Provost Cudd's assertion that Professor Sadowsky's performance had "declined rather than improved" was contradicted by Professor Sadowsky's improved teaching scores, the unanimous Tenure Committee's finding that his performance had "improved substantially," and President Esch's determination that Professor Sadowsky had "shown significant improvement."

151. Provost Cudd selectively relied upon an external evaluation authored by Kevin Ewert, who is the Director of Theatre, Chair Division of Communication and Arts.

152. Defendant's reliance upon that materially false characterization, together with its faculty-hiring pattern and more favorable treatment of female faculty members, supports the inference that Professor Sadowsky's sex was a motivating factor in the tenure decision.

153. Professor Sadowsky's sex was a motivating factor in Defendant's decision not to grant him tenure and promotion and in the resulting cessation of his tenure-stream employment.

154. Defendant intentionally discriminated against Professor Sadowsky because of his sex in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m).

155. Defendant's violations caused Professor Sadowsky the injuries and damages alleged above.

28

## COUNT III
## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE
## RACE AND SEX DISCRIMINATION
### *42 U.S.C. § 1983*

156. The preceding paragraphs are incorporated herein by reference and made a part hereof as if fully set forth herein.

157. At all relevant times, Defendant acted under color of state law in making the tenure, promotion, and employment decisions alleged herein.

158. The Equal Protection Clause of the Fourteenth Amendment protected Professor Sadowsky from intentional discrimination in public employment because of his race and sex.

159. Professor Sadowsky was qualified for tenure and promotion under Defendant's applicable standards.

160. Defendant intentionally treated Professor Sadowsky less favorably because he is White and male by denying him tenure and promotion under circumstances in which non-White and female faculty members received more favorable treatment.

161. The challenged denial of tenure and promotion constituted official University action because it was made or finally approved by an official possessing final policymaking authority.

29

162. By intentionally discriminating against Professor Sadowsky because of his race and sex, Defendant deprived Professor Sadowsky of the equal protection of the laws in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

163. Defendant's violation directly and proximately caused Professor Sadowsky the injuries and damages alleged herein.

## COUNT IV
## PENNSYLVANIA HUMAN RELATIONS ACT
## EMPLOYMENT DISCRIMINATION
### *42 U.S.C. § 1983*

164. The preceding paragraphs are incorporated herein by reference and made a part hereof as if fully set forth herein.

165. At all relevant times, Defendant was an employer subject to the PHRA.

166. Professor Sadowsky is White and male. The PHRA protects employees from discrimination because of race and sex and does not limit that protection to members of minority groups or to female employees.

167. Professor Sadowsky was qualified for tenure and promotion under Defendant's applicable standards, as demonstrated by, among other evidence, the unanimous recommendation of the nine-member Tenure and Promotion Committee and the successive recommendations of Dean Fitz and President Esch.

30

168. Defendant subjected Professor Sadowsky to adverse employment action by denying him tenure and promotion, placing him in a terminal appointment, and ending his tenure-stream employment.

169. Defendant granted tenure or otherwise applied its tenure and promotion standards more favorably to non-White and female faculty members under circumstances supporting an inference of discrimination because of Professor Sadowsky's race and sex.

170. Defendant's asserted teaching-performance rationale was pretextual for the reasons alleged above, including that Provost Cudd's central assertion that Professor Sadowsky's teaching had "declined rather than improved" was contradicted by the objective teaching data, the unanimous Tenure Committee's findings, and President Esch's independent assessment.

171. Defendant denied Professor Sadowsky tenure and promotion and terminated his tenure-stream employment because of Professor Sadowsky's race and sex.

172. Defendant thereby intentionally discriminated against Professor Sadowsky with respect to tenure and the terms, conditions, and privileges of employment in violation of Section 5(a) of the PHRA, 43 P.S. § 955(a).

31

173. Defendant's violations directly and proximately caused Professor Sadowsky the injuries and damages alleged above.

## COUNT V
### RETALIATION IN VIOLATION OF TITLE VII AND THE PENNSYLVANIA HUMAN RELATIONS ACT
### 42 U.S.C. § 2000e-3(a); 43 P.S. § 955(d)

174. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

175. Plaintiff engaged in activity protected by Title VII and the PHRA when he opposed race and sex discrimination and filed and pursued an EEOC charge alleging that Defendant had discriminated against him because of his race and sex. Plaintiff requested that the charge be jointly filed with the Pennsylvania Human Relations Commission.

176. Defendant received notice of Plaintiff's administrative charge and knew that Plaintiff had engaged in protected activity.

177. While Plaintiff's administrative charge remained pending and before his employment ended, Defendant interfered with his access to his University computer and research materials and thereafter prohibited him from entering any University property under threat of immediate arrest.

178. Defendant's denial of access, imposition and maintenance of the University wide Persona Non Grate restriction, threat of arrest, refusal to disclose

32

the underlying police report, and denial of Plaintiff's appeal constituted materially adverse actions that could dissuade a reasonable employee from making or supporting a charge of discrimination.

179.    The Persona Non Grata letter expressly connected the restriction to the employment action challenged by Plaintiff, stating: "This is regarding your separation from the University of Pittsburgh." A true and correct copy of the August 16, 2024 Persona Non Grata letter is attached hereto as Exhibit B.

180.    Defendant did not identify any violation of law or University policy that justified the restriction. Plaintiff had previously been informed that neither Human Resources nor the Office of Academic Affairs possessed any record of complaints against him by students, faculty, or staff.

181.    Defendant's asserted reliance upon Plaintiff's telephone conversation with Sofia Bednez was pretextual and does not explain the extraordinary breadth of the restriction, the threat of immediate arrest, or Defendant's refusal to disclose the allegations and police report underlying the restriction.

182.    The timing, nature, and breadth of Defendant's actions, together with the restriction's express connection to Plaintiff's separation, support an inference that Defendant imposed and maintained the restriction because Plaintiff had filed and pursued his administrative discrimination charge.

33

183. But for Plaintiff's protected activity, Defendant would not have imposed or maintained the Persona Non Grata restriction or subjected Plaintiff to the other materially adverse actions alleged herein.

184. Defendant retaliated against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e-3(a), and Section 5(d) of the PHRA, 43 P.S. § 955(d).

185. Defendant's unlawful retaliation directly and proximately caused Plaintiff the injuries and damages alleged herein.

## PRAYER FOR RELIEF

Plaintiff Daniel D. Sadowsky respectfully requests that this Honorable Court enter an Order granting Plaintiff relief as follows:

1. A declaration that Defendant discriminated against Professor Sadowsky because of his race and/or sex in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act;

2. A declaration that Defendant retaliated against Professor Sadowsky for engaging in activity protected by Title VII and the Pennsylvania Human Relations Act;

3. A declaration that Defendant, while acting under color of state law, intentionally discriminated against Professor Sadowsky because of his race and sex,

34

thereby depriving him of the equal protection of the laws in violation of the Fourteenth Amendment and 42 U.S.C. § 1983;

4. Appropriate equitable and injunctive relief, including:

a. instatement or reinstatement to an appropriate faculty position;
b. promotion to the rank of Associate Professor with tenure or, alternatively, a new and impartial review of Professor Sadowsky's application for tenure and promotion conducted without discrimination;
c. restoration of Professor Sadowsky's seniority, benefits, retirement contributions, and other incidents of employment;
d. expungement or correction of the records relating to the denial of Professor Sadowsky's tenure and promotion;
e. recission of Professor Sadowsky's Persona Non Grata designation and cessation of its enforcement;
f. expungement or correction of Defendant's police, security, human resources, and other records relating to the Persona Non Grata designation and the retaliatory actions alleged herein; and
g. an injunction prohibiting Defendant from engaging in further unlawful discrimination against Professor Sadowsky.

5. Back pay; front pay, if appropriate equitable placement is not feasible; lost wages; lost benefits; pension and retirement losses; and all other economic damage resulting from Defendant's unlawful conduct;

6. Compensatory damages for emotional distress, humiliation, inconvenience, loss of professional standing, damage to Professor Sadowsky's academic career, and other non-economic injuries;

7. Nominal damages for the violation of Professor Sadowsky's constitutional rights;

35

8.    Prejudgment and post-judgment interest to the fullest extent permitted by law;

9.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k) and 43 P.S. § 962(c.2); and

10.    Such other and further legal or equitable relief as this Court deems just and proper.

Respectfully submitted,

**DILLON McCANDLESS KING COULTER & GRAHAM LLP**

By: Thomas W. King III
       Thomas W. King, III, Esquire
       PA I.D. No. 21580
       tking@dmkcg.com

By: Thomas E. Breth
       Thomas E. Breth, Esquire
       PA I.D. No. 66350
       tbreth@dmkcg.com

*Counsel for Plaintiff*

36